IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| MO-KAN IRON WORKERS PENSION FUND, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 03-0267-CV-W-JTM ) ) |
| CHALLENGER FENCE CO. INC., | ) ) |
| Defendant. | ) ) |

# MEMORANDUM AND OPINION

On March 26, 2003, plaintiffs Mo-Kan Iron Workers Pension Fund, Mo-Kan Iron Workers Welfare Fund and Mo-Kan Workers Apprenticeship, Training and Education Fund[1] (collectively referred to as the "Mo-Kan Funds") filed the present action against defendant Challenger Fence Co. Inc. ("Challenger Fence"). In this action, the Mo-Kan Funds seek collection of allegedly delinquent contributions totaling $894,000.00 from Challenger Fence to employee benefit plans pursuant to the Employee Retirement, Income and Security Act of 1974, 29 U.S.C. §§ 1002, *et seq.* ("ERISA").

On February 22, 2005, the Court conducted a bench trial in this matter. At the trial, testimony was adduced from five witnesses, to wit: Michael Bright, Donald Greenwell, III, Robert Hulen, Amy Rote and Larry Schmidt. In addition 24[2] exhibits were offered as evidence

---

[1] The named plaintiffs also included R. Paul Jones and James Hutton, Jr. identified as trustees for each of the three named funds.

[2] The exhibits are number 1 through 25, with "Exhibit 23" being omitted.

1

into the record. Following the conclusion of the trial, both parties filed post-trial briefing with the Court.

The Court, being satisfied that the matter has been fully addressed (and neither party suggesting that further evidence or argument is necessary) and having carefully considered the evidence presented and the legal arguments advanced by the parties, renders the following findings of fact and conclusions of law.

In making these determinations the Court, at times, was required to resolve discrepancies between the testimony of witnesses. In making such credibility decisions, the Court took into account (1) the demeanor of the witnesses on the stand; (2) the interest the witnesses had in the outcome of the trial; (3) the opportunity of the witnesses to hear, observe, and recall what was said or done; and (4) any conflicts within a given witness' testimony. However, the Court has not undertaken to catalog in this order every credibility finding. The failure to specifically mention any particular testimony or documentary evidence herein is an indication that the Court did not find such evidence to be persuasive and/or credible or concluded that the evidence was not essential to the Court's legal findings.

Finally, for organizational purposes, the Court has differentiated – by headings herein – between findings of fact and conclusions of law. To the extent that any findings of fact include conclusions of law, or vice versa, and to the extent that this order contains mixed findings of fact and conclusions of law, the Court hereby adopts all of its findings of fact and conclusions of law under their appropriate classification.

## FINDINGS OF FACT

The Mo-Kan Funds were created by the agreement of the Builders Association of Missouri ("the Builders Association") and the International Association of Bridge, Structural and Ornamental Iron Workers Local No. 10 ("Iron Workers Local 10"). They are funded through contributions made by employer members of the Builders Association who are bound by collective bargaining agreements and trust agreements the Builders Association members entered on behalf of their employees. The board of trustees for the respective Mo-Kan Funds are comprised of three management trustees and three labor trustees.

Challenger Fence is a Kansas corporation that was started in 1993. The President of Challenger Fence is Larry D. Schmidt ("Schmidt"). While most of its business is residential fence installation, Challenger Fence also installs commercial fencing, including wood, chain-link, PVC, and hot iron fencing. Challenger Fence is not a member of the Builders Association. In October of 1999, Challenger Fence was subcontracted by general contractor Thomas & Egenhoefer to install a chain-link fence at the Kohl's Distribution Center in Blue Springs, Missouri (the Kohl's job"). Challenger Fence's winning bid for the Kohl's job was $78,000.

On October 26, 1999, Robert Hulen, ("Hulen") a business agent for Iron Workers Local 10 representative, visited the construction site for the Kohl's job, after receiving a call from a union member that there was a fence company (Challenger Fence) at the job site that the union member did not recognize. On that day, Challenger Fence had four employees at the site: Schmidt, his father (Francis Schmidt), his brother (Terry Schmidt), and Todd Stark. None of the employees belonged to the iron workers' union or any other union.

3

At the Kohl's job site on October 26, 1999, Hulen drove up in a truck and informed Schmidt that the Kohl's job was "a union job" and the Challenger Fence employees had "to be union." In fact, the Kohl's job was not a union job and there was no requirement that Challenger Fence's employees be union workers. Hulen then told Schmidt that he could satisfy the purported union requirement by obtaining "30-day passes" for the four Challenger Fence employees and paying the "prevailing wage" rate to the employees utilized at the Kohl's job site. Subsequently, a representative from the Operators Union appeared at the Kohl's job site and a discussion ensued between this individual and Hulen "as to how many people were going to be iron workers [and] how many people were going to be operators." Eventually, it was agreed that Schmidt and his father would be classified as operating engineers (and given 30-day permits by the Operators Union) and Todd Stark and Schmidt's brother would be classified as iron workers (and given 30-day permitsby the Iron Workers Union). Schmidt verbally agreed that he would pay the "prevailing wage" to his employees on the job site and he did so, even though the Kohl's job was not a union job.

Schmidt was then asked to accompany Hulen back to the union hall where he was shown a document entitled IRON WORKERS CONTRACT STIPULATION. Schmidt was led to believe by Hulen that the IRON WORKERS CONTRACT STIPULATION was a document Schmidt had to sign in order to obtain his 30-day permits.[3] Schmidt signed the IRON WORKERS CONTRACT

---

[3] The Mo-Kan Funds argue that the IRON WORKERS CONTRACT STIPULATION bound Challenger Fence to a collective bargaining agreement with the Builders Association and was not related to the 30-day permits. While, the Court finds the testimony of Hulen regarding his meeting with Schmidt to be largely lacking in credibility, some statements by Hulen were quite (unintentionally) illuminating. When asked about his conversation with Schmidt before the IRON WORKERS CONTRACT STIPULATION was signed, Hulen testified "[W]e just had a short conversation – he asked about the permits." Later, when Hulen was asked if he told Schmidt that the Kohl's job was a union job, Hulen testified that he "really [did not] recall . . . [i]t was a union job though." Finally, when asked yet again about his conversation with Schmidt regarding the IRON WORKERS CONTRACT STIPULATION, Hulen testified:

4

STIPULATION on behalf of Challenger Fence. The other signatures appearing on the IRON WORKERS CONTRACT STIPULATION – on behalf of Iron Workers Local 10 and each of the Mo-Kan Funds – were already affixed to the document before Schmidt signed and before any other references to Challenger Fence appeared in the document. These were the only dealings between Schmidt and Iron Workers Local 10 regarding the Kohl's job.

The IRON WORKERS CONTRACT STIPULATION provides that an employer signing the agreement:

(1) acknowledges receipt of the collective bargaining agreement "between the Builders Association of Missouri and International Association of Bridge, Structural and Ornamental Iron Workers, Local No. 10, AFL-CIO,"

(2) intends to pay the "prevailing wages," and

(3) agrees to be "bound by the current Collective Bargaining Agreement between the Contractor and the Union [*emphasis added*]."[4]

---

> We had a fairly short conversation, but I told him that the bargaining agreement, we would issue temporary permits for him to go ahead and finish this job that he had already started, and I think Larry and Terry was the ones we wrote the temporary permits for.

At no point did Hulen tell Schmidt that signing the Iron Workers Contract Stipulation would obligate Challenger Fence to pay the amounts to the Mo-Kan Funds at issue in this case. The Court finds that Schmidt reasonably believed that the IRON WORKERS CONTRACT STIPULATION related to the 30-day permit.

[4] At this time, Iron Workers Local 10 also had an alternative version of the IRON WORKERS CONTRACT STIPULATION that is nearly identical but reads that an employer agrees to be "bound by the current collective bargaining agreement between the Association and the Union [*emphasis added*]." This alternate version is actually annexed to the trust agreements for the Mo-Kan Funds but was not used, presented to, or signed by Schmidt on behalf of Challenger Fence.

5

As previously noted, the general contractor for the Kohl's job was Thomas & Egenhoefer. The IRON WORKERS CONTRACT STIPULATION did not define the term "Contractor" and Schmidt believed that the "Contractor" referenced in the IRON WORKERS CONTRACT STIPULATION was Thomas & Egenhoefer. Thomas & Egenhoefer was not a member of the Builders Association[5] and was not a signatory to any collective bargaining agreement with Iron Workers Local 10.

The Kohl's job took approximately 60 to 90 days to complete. The Challenger Fence employees did not renew their 30-day permits and made no efforts to participate in any union activities or seek union or Mo-Kan Fund benefits. With the exception of the 30-day permits issued in this case, Challenger Fence's Employees have never been union members while working for Challenger Fence. Challenger Fence has never contributed to any of the Mo-Kan Funds and between October 26, 1999, and early 2002, Challenger Fence did not receive any communication from Iron Workers Local 10 or from the Mo-Kan Funds.

In early 2002, Schmidt received an audit letter from the Mo-Kan Funds claiming that Challenger Fence was subject to the collective bargaining agreement with Iron Workers Local 10 and asserting that Challenger Fence owed monies to the respective funds. At the behest of the Mo-Kan Funds, Amy Rote with Construction Benefits Audit Corporation undertook an audit of the books and financial records of Challenger Fence. Rote identified numerous jobs performed by Challenger Fence between 1999 and 2003 within the geographical area that she believed were covered by the collective bargaining agreement between the Builders Association and Iron

---

[5] The Builders Association was an association of member contractors in the Kansas City metropolitan area that, as a single multi-employer bargaining group, negotiated contracts with Iron Workers Local 10. A list of contractors belonging to the Builders Association was maintained in the union hall for Iron Workers Local 10. Challenger Fence also did not belong to the Builders Association.

Workers Local 10. Rote's audit covered the time period from October 26, 1999 through September 30, 2003, and concluded that Challenger Fence owed the Mo-Kan Funds in excess of $894,000.00 in fringes, damages and interest, even though Challenger Fence's only meaningful contact with Iron Workers Local 10 stemmed from the Kohl's job for which Challenger Fence was paid a total of approximately $78,000.00.

## CONCLUSIONS OF LAW

As a general rule, it is unlawful for any employer to make payments "to any representative of his employees" or to "any labor organization" representing his employees. 29 U.S.C. § 186(a). In postulating this rule, however, Congress also expressly carved out certain exceptions. 29 U.S.C. § 186(c). In particular, Congress does permit such payments by an employer "with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents)." 29 U.S.C. § 186(c)(5).[6] Inasmuch as such "trust fund" payments are an exception to the general prohibition against employer payments, "[c]ourts require strict compliance" with prerequisites of

---

[6] The statute further requires that "(A) such payments are held in trust for the purpose of paying . . . for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund . . .; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities." 29 U.S.C. § 186(c)(5)(A)-(C).

7

the exception. *Rosen v. Biscayne Yacht & Country Club, Inc.*, 766 F.2d 482, 484 (11th Cir. 1985).

Balanced against this strict compliance, of course, is a recognition that such "trust fund" payments enure to the good of many people and "the failure of employers to make promised contributions imposes costs on plans that adversely affect beneficiaries." *Laborers' Pension Fund v. A & C Environmental Inc.*, 301 F.3d 768, 778 (7th Cir. 2002).[7] Concluding that earlier laws had been "insufficient and unnecessarily cumbersome and costly,"[8] Congress enacted 29 U.S.C. § 1145, which provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

Moreover, trust funds may directly enforce this obligation by a court action and, if successful, obtain an award for unpaid contributions, interest on such unpaid contributions (or liquidated damages), and attorneys fees. 29 U.S.C. § 1132(g)(2)(A)-(D).

In order to establish a *prima facie* claim for delinquent payments under 29 U.S.C. § 1145, the Mo-Kan Funds must establish " (1) they are multiemployer plans within the definition of ERISA . . . , (2) [Challenger Fence] is an employer obligated to pay contributions under the

---

[7] Another court has noted that "[b]y allowing multiemployer funds to enforce the literal terms of an employer's commitment, [ERISA collection actions] increases the reliability of their income streams, reduces the cost and delay associated with collection actions, and reduces or eliminates the cost of monitoring the formation of collective bargaining agreements." *Bakery and Confectionery Union and Industry International Pension Fund v. New World Pasta Co.*, 309 F.Supp.2d 716, 724 (D. Me. 2004)

[8] 126 Congr. Rec. 23039 (1980) (statement of Rep. Thompson).

8

terms of the plans, and (3) [Challenger Fence] failed to pay contributions in accordance with said terms." *New York State Teamsters Conference Pension and Retirement Fund v. Syracuse Movers, Inc.*, 2004 WL 2931663, op. at *5 (N.D.N.Y. Nov. 22, 2004). The record before the Court amply bears out that the Mo-Kan Funds satisfy the first and third requirements. The ultimate dispute before the Court then turns on the second requirement, namely, whether under the facts presented, Challenger Fence is an employer obligated to pay contributions under the terms of the plans. Thus, put most directly, the issue in this case is whether Challenger Fence is bound by the terms of the collective bargaining agreement negotiated by the Iron Workers Local 10 with the Builders Association.

By its plain terms, the collective bargaining agreement was reached by Iron Workers Local 10 and the Builders Association. Challenger Fence is not and was not a member of the Builders Association nor was Thomas & Egenheofer, the general contractor on the Kohl's job. However, the Mo-Kan Funds argue that the IRON WORKERS CONTRACT STIPULATION signed by Schmidt on behalf of Challenger Fence on October 26, 1999, in fact, obligated Challenger Fence to abide the terms and conditions of the collective bargaining agreement. According to the Mo-Kan Funds, the IRON WORKERS CONTRACT STIPULATION qualifies as a "pre-hire agreement."

Not surprisingly, federal law "prohibits employers and unions from entering into collective bargaining agreements unless the union is backed by a majority of the relevant bargaining unit's employees." *Cement Masons' Pension Fund, Local 502 v. Dukane Precast, Inc.*, 822 F.Supp. 1316, 1318 (N.D. Ill. 1993).[9] However, an exception is permitted in the

---

[9] Ordinarily, an agreement recognizing a union as the exclusive bargaining representative of an employer's work force when in fact only a minority of employees have authorized the union to represent their interests would constitute an unfair labor practice. *NLRB v. Local Union 103, International Association of Bridge Workers (Higdon Construction Co.)*, 434 U.S. 335, 344, 98 S.Ct. 651, 657 (1978).

9

building and construction industry where employments are often for a short duration and/or employees may be hired on a project-by-project basis. *Id*. at 1319. This exception permits an employer and a union to enter into a pre-hire agreement. 29 U.S. § 158(f).

Unfortunately, even calling the IRON WORKERS CONTRACT STIPULATION a pre-hire agreement, does not address the central question of whether the IRON WORKERS CONTRACT STIPULATION binds Challenger Fence to the terms and conditions of the collective bargaining agreement between Iron Workers Local 10 and the Builders Association. The answer to that question is governed by the language employed in the IRON WORKERS CONTRACT STIPULATION signed by Schmidt on October 26, 1999, which states:

> [The employer] hereby agrees with the Union to be bound by the terms of the current Collective Bargaining Agreement between the <u>Contractor</u> and the Union [*emphasis added*].

The Mo-Kan Funds acknowledge that the IRON WORKERS CONTRACT STIPULATION "is not perfectly worded," but argues that there is no ambiguity in the IRON WORKERS CONTRACT STIPULATION and that it "clearly[10] refers the reader back to the collective bargaining agreement" between Iron Workers Local 10 and the Builders Association. The Court does not agree. Indeed, if the IRON WORKERS CONTRACT STIPULATION is not ambiguous[11] it is only because the term "Contractor" clearly refers to the general contractor at the Kohl's job site, Thomas & Egenhoefer. In that case, Challenger Fence was agreeing to be bound by a collective bargaining

---

[10] If the version of the IRON WORKERS CONTRACT STIPULATION was so clear, then it is unlikely that Iron Workers Local 10 would have an alternate version of the agreement that substitutes the word "Association" in place of "Contractor."

[11] Under federal common law, an agreement is ambiguous where "reasonable people could find its terms susceptible to more than one interpretation." *Kennewick Irrig. Dist. v. United States,* 880 F.2d 1018, 1032 (9th Cir. 1989).

10

agreement that did not exist. This is because Thomas & Egenhoefer had no collective bargaining agreement with Iron Workers Local 10 and Thomas & Egenhoefer was not a member of the Builder's Association which did have a collective bargaining agreement with Iron Workers Local 10. Therefore, the IRON WORKERS CONTRACT STIPULATION cannot serve as a basis for forcing Challenger Fence to make payments to the Mo-Kan Funds based upon the collective bargaining agreement between Iron Workers Local 10 and the Builders Association.

Moreover, even if the IRON WORKERS CONTRACT STIPULATION is deemed ambiguous with respect to the use of the term "Contractor," which the Court believes is the case, then "the meaning of the [IRON WORKERS CONTRACT STIPULATION] becomes a question of fact." *Winthrop Resources Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 470 (8th Cir. 2004) (applying Nebraska law); *see also Local 369 Utility Workers v. NSTAR Electric and Gas Corp.*, 317 F.Supp.2d 69, 73 (D. Mass. 2004) (same holding under federal common law). In resolving this question of fact, it is appropriate for the Court to consider extrinsic, parol evidence to assist in determining the parties' intent. *Winthrop.*, 361 F.3d at 470. In this case, the Court concludes that the intent of the "Contractor" language was to refer to the general contractor at the job site, Thomas & Egenhoefer. Inasmuch as the general contractor in this case was not a party to the collective bargaining agreement, Challenger Fence is not bound by the collective bargaining agreement and had no obligation to the Mo-Kan Funds.[12]

---

[12] Alternatively, if Schmidt believed that the term "Contractor" in the IRON WORKERS CONTRACT STIPULATION referred to the general contractor and Hulen believed that it referred to Building Association, then there was no "meeting of the minds" and the IRON WORKERS CONTRACT STIPULATION void is *ab initio*.

11

In the alternative to the argument regarding the meaning of the term "Contractor," Challenger Fence also argues that it was defrauded into signing the IRON WORKERS CONTRACT STIPULATION. To that end, Challenger Fence asserts that it was falsely told that the Kohl's job was a "union job" and that only union workers could work on the project.[13] In addition, Schmidt testified credibly that he was misled by union officials into believing that the IRON WORKERS CONTRACT STIPULATION was merely a part of the process for obtaining a 30-day permit.

The Mo-Kan funds correctly argue that many traditional contract defenses are unavailable when an employer is attempting to avoid paying contributions to trust funds based on a pre-hire agreement. Among the defenses that the courts will not permit is fraud in the inducement. *See*, *e.g.*, *Local Union 1253, IBEW, AFL-CIO v. S/L Construction, Inc.*, 217 F.Supp.2d 125, 135-36 (D. Me. 2002). However, the cases make clear that other contractual defenses that render an agreement void *ab initio* may be maintained, including fraud in the execution. *See*, *e.g.*, *Id.*; *Gould v. Mobile Concrete Plumbing, Inc.*, 865 F.Supp. 619, 623 (W.D. Mo. 1994).[14]

---

[13] A position that Hulen continued to maintain in his testimony, but which the Couert discredits.

[14] Fraud in the inducement is the type of fraud that induces a party "to assent to something he otherwise would not have," while fraud in the execution is the type by which a party is induced "to believe the nature of his act is something entirely different than it actually is."

*Gould*, 865 F.Supp. at 623 (*quoting*, *in part*, *Southwest Adminsitrators, Inc. Rozay's Transfer*, 791 F.2d 769, 774 (9th Cir. 1986)).

12

Based on the facts found (and credibility determinations made), the Court alternatively finds that the IRON WORKERS CONTRACT STIPULATION was entered into through fraud in the execution. As noted by Chief Judge Whipple in another ERISA contribution case:

> [W]hen an employer signs a collective bargaining agreement that union officials represent to be something of a "wholly different nature," courts interpret this conduct as fraud in the execution.

*Gould*, 865 F.Supp. at 623-24 (*quoting, in part*, *Operating Engineers Pension Trust v. Gilliam*, 737 F.2d 1501, 1505 (9th Cir. 1984). By his words and deeds, Hulen conveyed to Schmidt the belief that the IRON WORKERS CONTRACT STIPULATION only related to the 30-day permits that were issued. Moreover, under the unique facts presented to the Court, Schmidt's ignorance of the true nature of the IRON WORKERS CONTRACT STIPULATION is excusable.

Finally, Challenger Fence further argues that even if the IRON WORKERS CONTRACT STIPULATION is not ambiguous and even if there was no fraud in the execution, then the pre-hire agreement cannot be enforced because, by its terms, it only became "valid and effective when approved by the Union "and the trustees for the Mo-Kan Funds. In response, the Mo-Kan Funds point out that the IRON WORKERS CONTRACT STIPULATION was executed by an individual on behalf of Iron Workers Local 10, as well as by that same individual and another person as trustees for the three Mo-Kan Funds. Moreover, the Mo-Kan Funds presented testimony that such trustees were authorized to sign such agreements on behalf of the individual funds. However, the credible testimony presented to the Court established that the IRON WORKERS CONTRACT STIPULATION was signed <u>in blank</u> by the union and the Mo-Kan Funds before Hulen ever approached Schmidt at the Kohl's job site.

The testimony presented by the Mo-Kan Funds did <u>not</u> establish that such endorsements before-the-fact are effective. Nor did the Mo-Kan Funds present any credible evidence of any subsequent ratification of the IRON WORKERS CONTRACT STIPULATION signed by Schmidt on October 26, 1999 by the Mo-Kan Funds after-the-fact. The Mo-Kan Funds bore the burden of proof of establishing their entitlement to relief in this action. As such, in the alternative, the Court finds that the Mo-Kan Funds did not show that all of the prerequisites to effectuating the validity of the IRON WORKERS CONTRACT STIPULATION were met so as to trigger any obligation on the part of Challenger Fence to make contributions to the funds. *Compare Carpenters Fringe Benefit Funds of Illinois v. McKenzie Engineering*, 217 F.3d 578, 582 (8th Cir. 2000) ("Under ERISA. . ., the Funds may collect only those contributions that [an employer] is contractually obligated to pay.").

For the foregoing reasons, pursuant to FED. R. CIV. P. 52(a), the Court enters its judgment in this matter in favor of defendant Challenger Fence Co. Inc. and against plaintiffs Mo-Kan Iron Workers Pension Fund, Mo-Kan Iron Workers Welfare Fund, Mo-Kan Workers Apprenticeship, Training and Education Fund, R. Paul Jones and James Hutton, Jr.

**IT IS SO ORDERED**.

        */s/ John T. Maughmer*
**John T. Maughmer**
**United States Magistrate Judge**